## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JANET SOMERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-11-724-M |
| | ) | |
| CUDD ENERGY SERVICES, INC., | ) | |
| and KRAIG A. BICKERSTAFF, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This case is scheduled for trial on the Court's June 2012 trial docket.

Before the Court is defendant Cudd Energy Services, Inc.'s ("Cudd") Partial Motion for Summary Judgment, filed April 5, 2012. On April 26, 2012, plaintiff filed her response, and on May 3, 2012, Cudd filed its reply. Based upon the parties' submissions, the Court makes its determination.

I.      Introduction

Plaintiff began her employment with Cudd on September 25, 2006, as the Parts/Inventory Supervisor for Cudd's Lindsay, Oklahoma MERC facility. Cudd, a wholly-owned subsidiary of RPC, Inc. ("RPC"), is an oilfield service company that provides a broad range of specialized oilfield services and equipment to businesses engaged in the exploration and production of oil and natural gas worldwide. Throughout her employment, plaintiff reported directly to Kraig Bickerstaff ("Bickerstaff"), the facility's Production Coordinator, whose employment at Cudd began on the same day as plaintiff's. Bickerstaff reported directly to Kelly Denton ("Denton"), the MERC Manager who oversaw Cudd's MERC facilities, including the Lindsay, Oklahoma facility.

As the Parts/Inventory Supervisor, plaintiff's duties and responsibilities included, among other things, organizing and managing the parts inventory for Cudd's Lindsay facility, checking purchase orders and shipments to ensure the correct quantities and shipments of parts were being received, returning any incorrect shipments or shipments that included damaged parts, as well as supervising the approximately four to five employees that comprised the Parts/Inventory Department. The Parts/Inventory Supervisor position was compensated at an hourly rate. In addition to the Parts/Inventory Supervisor, there were other supervisors at the facility in charge of overseeing the facility's other departments. These supervisors were paid a salary. These other supervisors were (1) the Maintenance Supervisor, who supervised the assembly and repair of new and used equipment, maintained records and maintenance data in the appropriate software databases, supervised hydraulic and electronic testing of equipment, and ordered parts for repair equipment; (2) the Manufacturing Supervisor, who created work orders and instructions for products to be manufactured at the facility, performed quality inspections of manufactured products, and supervised the welders and welder assistants within the manufacturing department; and (3) the Paint/Blasting Supervisor, who ensured that all sandblasting and painting was completed in a safe and timely manner, ordered supplies for the Paint/Sandblast department, set up and prepped parts and materials to be painted, and supervised all painters and blasters.

At all relevant times, Cudd had in place an anti-harassment policy prohibiting any forms of harassment and discrimination at any time which may relate to an individual's race, color, sex, age, religion, national origin, or other protected status. The policy provided examples of prohibited conduct, laid out a detailed complaint procedure, and stated any employee found to have violated the policy would be subject to disciplinary action, up to and including termination. The policy's

complaint procedure provided that in the event a complaint is against an employee's supervisor, an employee had the option of contacting RPC's Human Resource Manager, Cudd's Vice President of Corporate Administration, Cudd's General Counsel and Administrative Coordinator, RPC's Assistant Human Resource Manager or RPC's Director of Payroll and Benefits.  At the beginning of their employment, plaintiff and Bickerstaff both received a copy of Cudd's anti-harassment policy.  Cudd also provided plaintiff and Bickerstaff with training on its anti-harassment policy at the beginning of their employment as well as intermittently throughout their employment with Cudd.

In approximately March 2007, Steve Carr, a former Safety Executive for Cudd, forwarded an email to Stan Brouillette ("Brouillette"), RPC's Director of Human Resources, from an employee reporting that Bickerstaff was acting inappropriately towards both the male and female employees at the facility.  Brouillette conducted an investigation which ultimately resulted in corrective action being taken against Bickerstaff, as well as requiring Bickerstaff to attend a Skill and Managers Seminar in Houston.

Approximately three years later, in April 2010, plaintiff complained to Denton about Bickerstaff's treatment toward her and her male and female coworkers.  Plaintiff stated that Bickerstaff was rude and abusive and allegedly made inappropriate comments of a sexual nature regarding plaintiff, as well as other male and female coworkers, but primarily female coworkers.  Plaintiff informed Denton she did not want her complaint taken to Human Resources or anyone in management.  Prior to April 2010, plaintiff had never complained to Denton or any of the individuals specified in Cudd's anti-harassment policy about Bickerstaff's allegedly inappropriate behavior and mistreatment of herself and others.  In response to plaintiff's April 2010 complaint, Denton promptly counseled Bickerstaff, stating that inappropriate behavior would not be tolerated

and threatening further disciplinary action in the event any more complaints were made against him. After Denton counseled Bickerstaff, Bickerstaff's behavior substantially improved. Plaintiff, however, states that Bickerstaff informed her that he knew that she had told on him.

In May 2010, plaintiff was informed that Denton was being reassigned to Cudd's Canton, Pennsylvania facility and would be replaced by Cliff Weber ("Weber"). Upon learning that Denton was being replaced by Weber, Bickerstaff commented to plaintiff that "things were not going to change." On his first day at the Lindsay facility, Weber introduced himself to all of the facility's employees and had a one-on-one meeting with each of them. During her meeting with Weber, plaintiff informed him of having made a complaint regarding an employee's behavior but did not identify Bickerstaff as the perpetrator. Plaintiff also informed Weber that she feared that the alleged mistreatment would resume at some point in the future. In response, Weber informed plaintiff that he would not tolerate any inappropriate behavior under his supervision. Despite Weber's assurance that he would not tolerate any inappropriate behavior, plaintiff subsequently informed her coworker, Jonathon Cook, that she was quitting her employment with Cudd.

Immediately after learning of plaintiff's resignation, Weber contacted Brouillette on June 1, 2010, and informed him of his discussion with plaintiff. Brouillette immediately began an investigation into plaintiff's complaints, which consisted of speaking with plaintiff, Denton, and approximately twelve of plaintiff's coworkers. During Brouillette's investigation, plaintiff showed Brouillette notes plaintiff allegedly kept concerning Bickerstaff's behavior. Brouillette informed plaintiff that he did not want her to resign her employment with Cudd. During his investigation, Brouillette learned for the first time about plaintiff's April 2010 complaint regarding Bickerstaff and Denton's reprimand of Bickerstaff. At the close of his investigation and subsequent to plaintiff's

4

resignation, Brouillette concluded that Bickerstaff had acted inappropriately towards both male and female employees at the Lindsay facility and that his management style was not in-line with Cudd's needs and expectations.  As a result, Bickerstaff was terminated on June 21, 2010.

Plaintiff's last day of employment with Cudd was June 4, 2010.  Prior to resigning her employment, plaintiff met with the sellers of a convenience store in Lindsay, Oklahoma.  After her employment was terminated, plaintiff entered into a sales agreement to purchase the convenience store, and from that time until the present, plaintiff has operated the convenience store.

Immediately after Bickerstaff's termination, Robert Talk, Cudd's Executive Vice President of Corporate Services, and Weber met with plaintiff and asked her to come back to work for Cudd. Plaintiff was informed that Bickerstaff had been terminated and was offered an annual salary of $37,200 a year.[1]  Plaintiff was also offered a company vehicle.  Plaintiff did not accept Cudd's offer and responded that she wanted to think it over.  Plaintiff subsequently made a counter offer, which Cudd did not accept.

Cudd's COBRA benefits claims are handled by a third-party plan administrator, WestLake Financial ("WestLake").  Cudd alleges that WestLake, on June 25, 2010, mailed to plaintiff's last known address a notice alerting plaintiff of her rights under COBRA to elect a continuation of health insurance coverage.  Plaintiff disputes that the COBRA notice was mailed to her address after her resignation.  On September 8, 2010, plaintiff complained to Brouillette that she did not receive the notice.  Thereafter, on September 21, 2010, plaintiff finally received the COBRA documents.

---

[1]Plaintiff alleges that although this reinstatement offer was slightly more than her compensation at the time of her termination, it was still significantly less than the wages she earned prior to Cudd eliminating her overtime guarantee in 2008.

On June 27, 2011, plaintiff filed the instant action against defendants asserting the following claims: (1) a Title VII claim of a hostile work environment based on the alleged behavior of Bickerstaff, (2) a Title VII retaliation claim[2], (3) a claim under the Oklahoma Anti-Discrimination Act ("OADA"), (4) a claim of intentional infliction of emotional distress based upon Bickerstaff's alleged conduct, (5) an Equal Pay Act ("EPA") claim, (6) wage claims brought under the Fair Labor Standards Act ("FSLA"), and (7) a COBRA claim alleging that Cudd failed to provide her with timely notice of her right to continuation coverage under COBRA.  Cudd now moves for summary judgment as to all of the above claims except plaintiff's FLSA claims regarding not being compensated for unreported work time or for work allegedly performed when plaintiff was called into work while on-call.

II.      Summary Judgment Standard

"Summary judgment is appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  The moving party is entitled to summary judgment where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  When applying this standard, [the Court] examines the record and reasonable inferences drawn therefrom in the light most favorable to the non-moving party."  *19 Solid Waste Dep't Mechs. v. City of Albuquerque*, 156 F.3d 1068, 1071-72 (10th Cir. 1998) (internal citations and quotations omitted).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Furthermore, the non-movant has a burden of doing more than simply showing there is some metaphysical doubt as to the material facts.

---

[2]In her response, plaintiff states that she is dropping her cause of action for retaliation.

6

Rather, the relevant inquiry is whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Neustrom v. Union Pac. R.R. Co.*, 156 F.3d 1057, 1066 (10th Cir. 1998) (internal citations and

quotations omitted).

III.   Discussion

    A.   Hostile Work Environment Claim

     Cudd asserts that plaintiff's hostile work environment claim fails as a matter of law.

Specifically, Cudd asserts that plaintiff did not suffer a tangible employment action, and, therefore,

Cudd is not liable under the *Faragher/Ellerth*[3] affirmative defense.   Plaintiff contends that Cudd

committed a tangible employment action.   Plaintiff further contends that Cudd is liable for

Bickerstaff's actions because Cudd knew, or should have known, about Bickerstaff's actions and

failed to respond in a reasonable manner.

> An employer is subject to vicarious liability to a victimized employee
> for an actionable hostile environment created by a supervisor with
> immediate (or successively higher) authority over the employee.
> When no tangible employment action is taken, a defending employer
> may raise an affirmative defense to liability or damages, subject to
> proof by a preponderance of the evidence, see Fed. Rule Civ. Proc.
> 8(c).   The defense comprises two necessary elements: (a) that the
> employer exercised reasonable care to prevent and correct promptly
> any sexually harassing behavior, and (b) that the plaintiff employee
> unreasonably failed to take advantage of any preventative or
> corrective opportunities provided by the employer or to avoid harm
> otherwise.   While proof that an employer had promulgated an
> antiharassment policy with complaint procedure is not necessary in
> every instance as a matter of law, the need for a stated policy suitable
> to the employment circumstances may appropriately be addressed in
> any case when litigating the first element of the defense.   And while

---

[3]*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524
U.S. 742 (1998).

> proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807-808.

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. "A tangible employment action in most cases inflicts direct economic harm." *Id.* at 762. Plaintiff asserts that her constructive discharge amounts to a tangible employment action. Plaintiff bases her constructive discharge claim on Bickerstaff's comment, upon learning that Denton was being replaced by Weber, that "things were not going to change." Cudd contends that plaintiff can not establish a constructive discharge.

> A constructive discharge occurs when a reasonable person in the employee's position would view her working conditions as intolerable and would feel that she had no other choice but to quit. In determining whether an employee's working conditions would cause such feelings in a reasonable person, we apply an objective test under which neither the employee's subjective views of the situation, nor her employer's subjective intent with regard to discharging her, are relevant. The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions. Further, conduct which meets the definition of a "tangible employment action" or an "adverse employment action" is not necessarily sufficient to establish a constructive discharge because a constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable.

8

*Tran v. Trs. of the State Colls. in Colo.*, 355 F.3d 1263, 1270-71 (10th Cir. 2004) (internal citations omitted).

The Court has carefully reviewed the parties' briefs and evidentiary submissions.  Viewing the evidence in the light most favorable to plaintiff and viewing all reasonable inferences in plaintiff's favor, the Court finds plaintiff has failed to present evidence sufficient to raise a genuine issue as to whether she suffered a constructive discharge.  Specifically, the Court finds that plaintiff was not faced with a situation that was so intolerable that a reasonable person would feel that she had no other choice but to resign.  The Court finds that Bickerstaff's alleged comment falls far short of forming the basis for a constructive discharge.  At the time Bickerstaff made the alleged comment, his objectionable conduct had substantially improved.  Additionally, plaintiff has admitted that once she complained to Weber that she feared prior mistreatment would resume, she had no reason not to believe Weber's assertions that inappropriate behavior would not be tolerated under his supervision.  Further, it is undisputed that Brouillette told plaintiff that he did not want her to resign and he was going to investigate her allegations.  The timing of plaintiff's purchase and operation of a convenience store provides further support for finding that plaintiff did not resign because of intolerable working conditions.  Finally, Cudd's request that plaintiff not resign and its offer of re-employment after Bickerstaff's termination further demonstrates no constructive discharge.

Because the Court finds that plaintiff has not established a constructive discharge in this case, the Court finds that there was no tangible employment action and that Cudd may raise the *Faragher/Ellerth* affirmative defense.  As noted earlier, the affirmative defense recognized by *Faragher* and *Ellerth* "comprises two necessary elements: (a) that the employer exercised reasonable

9

care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

"The first element of the *Faragher/Ellerth* defense actually imposes two distinct requirements on an employer: (1) the employer must have exercised reasonable care to prevent sexual harassment and (2) the employer must have exercised reasonable care to correct promptly any sexual harassment that occurred." *Helm v. State of Kan.*, 656 F.3d 1277, 1288 (10th Cir. 2011). Based upon the undisputed evidence, the Court finds that Cudd exercised reasonable care to prevent sexual harassment. At all relevant times, Cudd had an anti-harassment policy prohibiting any type of harassment or discrimination based upon an individual's race, color, sex, age, religion, national origin, disability, or other protected status. The policy included a detailed complaint procedure and explained that in the event that a complaint is against an employee's supervisor, an employee had the option of notifying RPC's Human Resource Manager or the Cudd Vice President of Corporate Administration, as well as Cudd's General Counsel Administrative Coordinator, RPC's Assistant Human Resource Manager, and/or the Director of Payroll and Benefits. Additionally, it is undisputed that plaintiff was given a copy of Cudd's anti-harassment policy, signed an acknowledgment of her receipt of the policy, and also received sexual harassment training.

"[I]n order to establish that it took proper action to correct harassment, [an employer is] required to show that it acted reasonably promptly on [the employee's] complaint when it was given proper notice of the allegations as required under its complaint procedures." *Helm*, 656 F.3d at 1290 (internal quotations and citation omitted). "An employer's reasonable remedial measures should

be designed to stop the harassment, correct its effects on the employee, and ensure that the harassment does not recur." *Christian v. AHS Tulsa Reg'l Med. Ctr., LLC*, 430 Fed. App'x 694, 698 (10th Cir. 2011) (internal quotations and citation omitted).  "The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Helm*, 656 F.3d at 1290 (internal quotations and citation omitted).

Having carefully reviewed the parties' submissions, the Court finds that the undisputed facts demonstrate that Cudd exercised reasonable care to correct promptly any sexual harassment that occurred.  Plaintiff reported Bickerstaff's behavior to Denton in April of 2010, while Bickerstaff was out of the office.  Upon his return, Denton immediately counseled Bickerstaff on his behavior, and Bickerstaff's behavior improved substantially.  One month later, when plaintiff informed Weber she was fearful of the conduct picking up again, Weber responded with reassurances that such conduct would not be tolerated under his supervision.  Moreover, once Weber was informed plaintiff was resigning, he contacted Brouillette, who immediately began an investigation into plaintiff's allegations that ultimately led to Bickerstaff's termination.

Therefore, the Court finds that Cudd has satisfied the first prong of the *Faragher/Ellerth* affirmative defense.  The Court, therefore, must now turn to the question of whether plaintiff unreasonably failed to avail herself of the preventive or corrective opportunities afforded her. "[U]nreasonable failure to use any complaint procedure provided by the employer . . . will normally suffice to satisfy the employer's burden under the second element of the defense." *Faragher*, 524 U.S. at 807-08; *Ellerth*, 524 U.S. at 765.  Further, "[a]n employer may satisfy the second element of the *Faragher/Ellerth* defense by showing that the victimized employee unreasonably delayed in

11

reporting incidents of sexual harassment." *Helm*, 656 F.3d at 1291.  Additionally, a generalized fear of retaliation is not sufficient to explain a long delay in reporting sexual harassment.  *See Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1063 (10th Cir. 2009).

Having carefully reviewed the parties' submissions, and viewing the evidence in the light most favorable to plaintiff, the Court finds that Cudd has met its burden of establishing that plaintiff unreasonably failed to avail herself of the preventive or corrective opportunities afforded her. Specifically, plaintiff alleges that Bickerstaff's conduct began in early 2007 and continued until she complained to Denton in April 2010.  Plaintiff admits that during this more than three-year period, she did not complain or use Cudd's sexual harassment reporting system.  Further, when plaintiff did complain, she did not notify any of the individuals specifically listed in Cudd's anti-harassment policy and, in fact, told Denton she did not want her complaint taken to Human Resources or anyone in management.   The Court finds plaintiff's approximately three-year delay in reporting Bickerstaff's conduct clearly was unreasonable.  The Court further finds that plaintiff's general assertion that she failed to report Bickerstaff's harassment earlier because she feared retaliation is insufficient as a matter of law to excuse her decision to refrain from reporting Bickerstaff's alleged conduct for almost three years.

Accordingly, based on the above, the Court finds that Cudd has satisfied both prongs of the *Faragher/Ellerth* affirmative defense.  Plaintiff's claim of hostile work environment based upon vicarious liability, therefore, fails as a matter of law.

Plaintiff also contends Cudd is liable for the hostile work environment under a theory of negligence.  "An employer can be liable for Title VII sexual harassment engaged in by its supervisor if its negligence caused the harassment."  *An v. Regents of the Univ. of Cal.*, 94 Fed. App'x 667,

675-76 (10th Cir. 2004). "Employer negligence is failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *Id.* at 676 (internal quotations and citations omitted). Further, a negligence claim requires a showing that after the employer knew or should have known of the sexual harassment, it failed to take prompt, adequate and effective remedial action. *See id.* (internal quotations and citations omitted).

Having carefully reviewed the parties' submissions, the Court finds that plaintiff has not presented sufficient evidence to create a genuine issue of fact as to whether Cudd's management-level employees knew, or in the exercise of reasonable care should have known, of the alleged hostile environment created by Bickerstaff prior to plaintiff's complaints. Further, as set forth above, the Court finds that after Cudd knew of the alleged hostile work environment, it took prompt, adequate and effective remedial action. Accordingly, the Court finds that plaintiff's claim of hostile work environment based upon negligence also fails.

Therefore, the Court finds that Cudd is entitled to summary judgment as to plaintiff's hostile work environment claim.

B.    OADA Claim

Plaintiff also brings a claim of discrimination under the OADA, which prohibits an employer's discriminatory acts toward, or discharge of, a person because of gender. *See* Okla. Stat. tit. 25, § 1302. To establish a claim under the OADA, a plaintiff must show: "(1) an actual or constructive discharge (2) of an at-will employee (3) in significant part for a reason that violates an Oklahoma public policy goal (4) that is found in Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision that prescribes a norm of conduct for Oklahoma and (5)

13

no statutory remedy exists that is adequate to protect the Oklahoma public policy goal." *Kruchowski v. Weyerhaeuser Co.*, 202 P.3d 144, 151-52 (Okla. 2008).  It is undisputed that plaintiff was not actually discharged.  Additionally, as set forth in section III(A), this Court finds that plaintiff has failed to present evidence sufficient to raise a genuine issue as to whether she suffered a constructive discharge.  Accordingly, the Court finds that Cudd is entitled to summary judgment as to plaintiff's OADA claim.

C.      Intentional Infliction of Emotional Distress Claim

To establish a prima facie case of intentional infliction of emotional distress, a plaintiff must demonstrate: (1) that the tortfeasor acted intentionally or recklessly; (2) that the tortfeasor's conduct was extreme and outrageous; (3) that plaintiff actually experienced emotional distress; and (4) that the emotional distress was severe.  *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 (10th Cir. 1991) (applying Oklahoma law).  "As a threshold matter, courts should determine whether the conduct at issue is sufficient under the extreme and outrageous standard as a matter of law."  *Id.* at 1388.

> Intentional infliction of emotional distress does not provide redress for every invasion of emotional serenity or every anti-social act, and it does not protect mere hurt feelings, no matter how justified. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.  The test is whether the alleged tortfeasor's conduct is simply one of those unpleasant examples of human behavior which we all must endure from time to time, or whether it has so totally and completely exceeded the bounds of acceptable social interaction that the law must provide redress.  This court has agreed that the line between the acceptable and the unacceptable should be drawn in accordance with Comment d to § 46 of the Restatement (Second):
>
>> ". . . Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

> decency, and to be regarded as atrocious, and utterly
> intolerable in a civilized community.  Generally, the
> case is one in which the recitation of the facts to an
> average member of the community would arouse his
> resentment against the actor, and lead him to exclaim,
> 'Outrageous!' . . ."

*Miller v. Miller*, 956 P.2d 887, 900-901 (Okla. 1998) (internal citations omitted).

Having carefully reviewed the parties' submissions, the Court finds plaintiff has not set forth sufficient evidence upon which reasonable people could conclude that Cudd's conduct was extreme and outrageous.  Specifically, the Court finds that plaintiff has presented no evidence showing that Cudd's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Accordingly, the Court finds that Cudd is entitled to summary judgment as to plaintiff's intentional infliction of emotional distress claim.

D.     EPA Claim

The EPA provides, in pertinent part:

> No employer having employees subject to any provisions of this
> section shall discriminate, within any establishment in which such
> employees are employed, between employees on the basis of sex by
> paying wages to employees in such establishment at a rate less than
> the rate at which he pays wages to employees of the opposite sex in
> such establishment for equal work on jobs the performance of which
> requires equal skill, effort, and responsibility, and which are
> performed under similar working conditions, except where such
> payment is made pursuant to (i) a seniority system; (ii) a merit
> system; (iii) a system which measures earnings by quantity or quality
> of production; or (iv) a differential based on any other factor other
> than sex . . . .

29 U.S.C. § 206(d)(1).

There are two steps in [a court's] analysis of an EPA claim.  First, the plaintiff must establish a prima facie case of discrimination by

15

> demonstrating that employees of the opposite sex were paid differently for performing substantially equal work. If the plaintiff meets her prima facie case, the burden of persuasion then shifts to the defendant to prove that the wage disparity was justified by one of four permissible reasons, including disparity based on any factor other than sex.

*Lewis v. D.R. Horton, Inc.*, 375 Fed. App'x 818, 823 (10th Cir. 2010) (internal quotations and citations omitted). To establish a prima facie case under the EPA, a plaintiff must show that: "(1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; (3) the male employees were paid more under such circumstances." *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1364 (10th Cir. 1997) (internal quotations and citations omitted).

The "equal work" requirement of the EPA is not construed broadly; failure to furnish equal pay for "comparable work" or "like jobs" is not actionable. *See id.* "Rather, in order to prevail in such an EPA action, the jobs must be 'substantially equal' in terms of 'skill,' 'effort,' 'responsibility,' and 'working conditions.'" *Id.* (internal quotations and citation omitted). Further, to satisfy her prima facie showing, a plaintiff must produce evidence that she performed substantially all of the duties of a higher-paid co-worker and not just some of the job duties. *See Lewis*, 375 Fed. App'x at 823.

Plaintiff asserts that she was paid less than the Maintenance Supervisor, Manufacturing Supervisor, and Paint/Plastering Supervisor and that she was not provided with a company vehicle when these others supervisors were provided one. Cudd contends that plaintiff cannot establish the "equal work" requirement of her prima facie case and, in the alternative, that the decision regarding company vehicles was based on a factor other than sex.

16

Having carefully reviewed the parties' submissions, and viewing the evidence in the light most favorable to plaintiff, the Court finds that plaintiff has produced no evidence to show that her job as the Parts/Inventory Supervisor was substantially equal to that of the Maintenance Supervisor, the Manufacturing Supervisor, or the Paint/Plastering Supervisor.  There is simply insufficient evidence that these other supervisor jobs required equal skill, effort, and performance as compared to plaintiff's position.  As the job descriptions of each of these supervisors[4] reflect, each position entailed entirely different duties and responsibilities, utilizing distinct skills within separate departments.  The fact that all of the supervisors supervised approximately the same number of employees is simply not enough to establish that plaintiff's job as the Parts/Inventory Supervisor was substantially equal to that of the Maintenance Supervisor, the Manufacturing Supervisor, or the Paint/Plastering Supervisor.  At most, plaintiff's job functions were merely comparable to those of the other supervisors.  The Court, therefore, finds that plaintiff has not made a prima facie case under the EPA.

Accordingly, the Court finds that Cudd is entitled to summary judgment as to plaintiff's EPA claim.

E.    FLSA Claim

Plaintiff also asserts a claim under the FLSA for wages connected to the time she spent "on-call" during her employment with Cudd.  "The test to determine whether an employee's on-call time constitutes working time is whether the time is spent predominantly for the employer's benefit or for the employee's.  That test requires consideration of the agreement between the parties, the nature and extent of the restrictions, the relationship between the services rendered and the on-call time and

_____

[4]The job descriptions are set forth in the Introduction.

all surrounding circumstances." *Andrews v. Town of Skiatook, Okla.*, 123 F.3d 1327, 1330 (10th Cir. 1997) (internal citations omitted).  Further, "the test is not whether there was some restriction on Plaintiff's personal activities.  Rather the test is whether Plaintiff's on-call time was spent predominantly for the benefit of his employer." *Id.* at 1332.

Having carefully reviewed the parties' submissions, and viewing the evidence in the light most favorable to plaintiff, the Court finds that even though plaintiff's activities may have been somewhat restricted while she was on call, the restrictions were not so burdensome as to render it time predominantly spent for the benefit of Cudd.  Additionally, the Court finds that plaintiff was free to pursue personal activities with little inference while she was on call.  Accordingly, the Court finds that under the facts of this case, plaintiff's personal pursuits were not restricted to such a degree as to require that plaintiff's on-call time be compensated under the FLSA.

The Court, therefore, finds that Cudd is entitled to summary judgment as to plaintiff's claim under the FLSA for wages connected to the time she spent "on-call" during her employment with Cudd.

F.     COBRA claim

COBRA requires that employers provide former employees an opportunity to continue health care coverage under the employer's group health plan if a qualifying event occurs.  *See* 29 U.S.C. § 1161(a).  Once a qualifying event occurs, such as termination, the employer must notify the plan administrator within thirty days of the date of the qualifying event, and the administrator must then notify "any qualified beneficiary" of her COBRA rights within fourteen days of the date on which the administrator is notified of the qualifying event.  *See* 29 U.S.C. § 1166.  Plaintiff asserts that

Cudd failed to timely provide her with proper notice of her right under COBRA to a continuation of health insurance coverage.

In an action under COBRA, "the administrator bears the burden of proving adequate COBRA notice was given." *Smith v. Rogers Galvanizing Co.*, 128 F.3d 1380, 1383 (10th Cir. 1997). Although COBRA contains no specific requirements as to the manner in which notice must be given, the Tenth Circuit has recognized that "a good faith attempt to comply with a reasonable interpretation of the statute is sufficient." *Id.* at 1383-84. The vast majority of courts adopting the "good faith" standard have held that COBRA compliance does not require proof that the former employee actually received notice. *See Daneshvar v. Graphic Tech., Inc.*, 40 F. Supp. 2d 1225, 1242 (D. Kan. 1998) (citing numerous cases). Numerous courts have also held that an employer complies with § 1166(a) by sending notice via first class mail to the last-known address of an employee. *See*, *e.g.*, *Austin v. Jostens, Inc.*, No. 07-2380-JAR, 2008 WL 4642277, at *13-14 (D. Kan. Oct. 16, 2008); *Myers v. King's Daughters Clinic*, 912 F. Supp. 233, 236 (W.D. Tex. 1996); *Jachim v. KUTV Inc.*, 783 F. Supp. 1328, 1333-34 (D. Utah 1992).

Upon review of the parties' submissions, and viewing the evidence in the light most favorable to plaintiff, the Court finds that Cudd has sustained its burden of proving that adequate COBRA notice was given to plaintiff. Specifically, Cudd has presented evidence that notice was sent via first class mail to the last-known address of plaintiff. Cudd has provided evidence pertaining to the automated system upon which COBRA notices are generated, actual dated copies of the letters that were mailed to plaintiff's last known address, and an audit report which shows the date that the letter was mailed to plaintiff. *See* Declaration of Ieena Aulakh, attached as Exhibit 8 to Cudd's Partial Motion for Summary Judgment and Brief in Support; June 25, 2010 letter to

plaintiff, attached as Exhibit 1 to the Declaration of Ieena Aulakh; PQB Detail Report, attached as Exhibit 5 to the Declaration of Ieena Aulakh.  Based upon this evidence, the Court finds that Cudd sent the notice pursuant to a procedure that constitutes a good faith effort to transmit a COBRA notice to plaintiff.

Accordingly, the Court finds that Cudd is entitled to summary judgment as to plaintiff's COBRA claim.

IV.   Conclusion

For the reasons set forth above, the Court GRANTS Cudd's Partial Motion for Summary Judgment [docket no. 33].

**IT IS SO ORDERED this 21st day of May, 2012.**

VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE